Good morning. I'm Margaret Weatherall from Keller-Rorbach here in Seattle, and I'm joined at council table by my partner, Mark Griffin. Before we get started, I'd like to reserve three minutes for rebuttal, and may I approach? I'd like to hand up a case. Sure. If you give it to Kathy, she'll pass it up to us. Good morning. My client, RMS, is here asking you to reverse the district court's decision as well as not to follow four decisions from other courts in other jurisdictions that St. So the question this morning is, why should you do something different? And the answer is threefold. Number one, there's different policy language from two of those decisions, and it's very important that we look very closely at it this morning. Number two, Washington has different rules of policy interpretation, and our job this morning is to talk about what the Washington court would do with this policy language. And third, Washington's duty to defend standard is different from the standard found in other jurisdictions. So let's start with that policy language. Let's start with the policy language. It seems like all the cases dealing with these advertising injury cases, or maybe that's stated differently, the cases dealing with this right of privacy issue seem to divide right of privacy into secrecy and seclusion. In other words, seclusion, the right to be left alone, secrecy, I'm trying to keep something private, my social security number or the fact that I was arrested for marijuana possession or something of that nature. Do you agree? Yes, I agree that the term privacy is defined by the dictionary, which is what the Washington Supreme Court tells us we're supposed to do when there's an undefined term in the policy. Washington court says, go to the dictionary, find out what the dictionary says. All the courts that have considered the St. Paul policy have all held that what we're talking about here is secrecy, not seclusion. You're right, Your Honor, and here's where the error exists. There are two problems. Actually, there are many, but we're going to talk about two. Number one, there are two kinds of St. Paul language. One kind of St. Paul language is at issue here, and it says, making known to any person or organization covered material that violates a person's right of privacy. That language was only discussed in the Melrose case as a published decision in the Brother case, which is an unpublished trial court decision in the District Court in New Jersey. So this is not a landslide of cases that have looked at this language. It's one circuit court. And the differences at the other cases said written or oral communication or something like that? The differences at the other cases talk only about the term material, and they do not define covered material. The policy at issue here defines covered material, and we argue that St. Paul completely ignores the definition of covered material that it provides in its own policy. Now, where is the definition? The definition you can find in our brief at the beginning where we go through all of the policy language. Where is it in the actual policy? In the actual policy, you will find it in the definition section, and I'm afraid I can't give you the specific number, but I can read to you right now the specific definition of covered material. It is any material in any form of expression, including material made known in or with any electronic means of communication, such as the Internet. Now, the key here is under Washington law, we are to read the policy as a whole to give force and effect to every clause. So we need to take this definition, and we need to plug it back into the key ensuring language. And this is what happens. Here's how it goes. Making known to any person or organization any material in any form of expression, I'm going to leave out the subclause, that violates a person's right of privacy. I don't understand what the difference is. The difference here is that St. Paul tells us that it must be secret material. Well, if you read with the covered material definition in the ensuring language, it says any material. But what about the making known language? Making known is very important, you're right. But let's go back to the definition of covered material. Here, we've used the same term again. Now, this isn't a definition of making known, but it is the same term, and it is used in the definition. Let's see what it says. Including material made known in or with any electronic means of communication such as the internet. Now, there's nothing there that says that making known means disclosure. It just means disseminated, distributed. There's no key here that would tell an ordinary purchaser, under Washington law, we are to construe the policy as an ordinary purchaser were. There's nothing there that says made known means disclosure of secret information. Does making known to any person material that violates the right to privacy? Wouldn't an ordinary reader of that think that means revealing private information? No, Your Honor, I don't think that it does. I think that what we need to do is look at the fact that it says any material in any form disclosed to any person. For St. Paul's argument to work, it has to be disclosure to a third person. It has to be disclosure of secret information. Now, do you see what I'm doing here? I'm reading multiple additional terms into this poor little sentence that only fills up a line and a half. Washington courts don't do that. Do you know where this covered material is so I can read it along with the provision? You have no idea where it is in the agreement? I'm going to ask my co-counsel to consult a copy of the policy in the record and find the specific page number for you. Where is it in the brief? In the brief, it is... Your Honor, you'll find it on page 9 of our brief, our opening brief. But under your interpretation, then any communication I receive violates my right of privacy if it's something that I didn't want. I mean, I have a right to be left alone, and yet I get an e-mail or I get a letter. I get a telephone call from, and you're going to find this hard to believe this time of year, from somebody saying, vote for candidate A, not for candidate B. Right? Your Honor, if you go back to the underlying legislation here, the TCPA, there's legislative history. We don't include it in our brief. If you go to the TCPA, there is a strong body of material indicating that the legislature's hope in passing the TCPA was to avoid the problem of electronic fax messages arriving in people's fax machines that they did not want to receive. I understand that, but I don't care about the statute. I care about the policy that we're considering. The language here is what's important. Under your interpretation of the policy, any unwanted fax that I receive, any unwanted communication, a telephone call, or somebody at the door trying to give me religious material that I said, I didn't want that, I want to be left alone, you're saying that violates the policy and saying Paul Lynn has a duty to defend me if I have this policy. I have two responses, Your Honor. That is what I'm saying. But within the policy language, it must be advertising, it must be in the course of advertising. So this is not a wide-open component. Number two, under Washington rules of construction, if St. Paul wanted something different, if they wanted this language to be crystal clear, they had the opportunity to do that. This policy was written by St. Paul, and if St. Paul had something different in mind, which, as I've noted, they had all these other words that they used to actually explain what this policy language means, if they had that in mind, they could have substantially differently drafted this policy language. They did not. And under Washington rules of construction, where there is ambiguity, the policyholder is given the benefit of the doubt. And that's what is happening here. But what happened, I'm going to move us on to the question of What's the ambiguity here, then? The ambiguity is that if you read the covered material definition back into the insuring language, you cannot get to St. Paul's very restrictive, exclusionary version of the insuring language. The Washington court tells us in Boeing that the insuring language is a very strange place to find exclusions. The second place where there's ambiguity is in the term privacy. Almost every court, regardless of whether it's the St. Paul language or another language that's not at issue here, has noted that this term privacy, as you explained, has at least two meanings. When the Washington court finds a term that is undefined, the Washington court goes to the dictionary to find out what it should say. And when there are two accepted, reasonable meanings, the Washington court finds that there is an ambiguity. And that is construed against the carrier that wrote the policy. And the Washington court has done that time and time again. St. Paul will tell you, well, you have to read it in context. That's fine. That's a little bit what the Washington court is doing. But what the Washington court is really doing, they do not say read it in context. They have their whole litany of rules of construction, and it begins with read the whole policy to give every clause force and effect. That's a little bit different from this read it in context argument. And you can see that distinction if you look at Bank of the West, which is a California decision. The cover material provision was to make sure that it could cover electronic. It didn't just cover written and oral. There must have been some problem that arose someplace where somebody said, well, it doesn't cover an email. And this was just to assure that the media covered, not the content, but the media was essentially any form of communication. I don't see how it has any relationship to our problem. It has every relationship to our problem because our next question is, could there conceivably be coverage? Could the Washington court conceivably find coverage under this language? Because if the Washington court could conceivably find coverage, then there was a duty to defend. And when you look at this covered material definition and you put it right back into the insuring language, you come up with a different interpretation. It doesn't tell you anything about whether it's the content or the repetitiveness that's relevant. It doesn't tell you that. And, Your Honor, I would say that is exactly the point. It doesn't tell you that. If there is nothing at anything is what I'm saying. It does not change the conclusion that one would come to if it just said material with regard to the problem that we're looking at. Material could be read perhaps as only written or oral, so they are trying to tell you, no, it's anything. But it doesn't tell you anything. It doesn't help you with regard to the problem we're looking at, which is what about the material do we care about? It doesn't help you with that. Your Honor, I would suggest that you look at it a little bit differently. I don't believe, we don't believe, that there's anything in this insuring language that tells you one way or another whether you are looking at the content. But you are trying to use this to distinguish the uniform case law about this clause. And you're saying there is something about this covered material definition that should have for which we should look at it differently than the other cases did. And I'm saying I'm not seeing that so far. So if you want me to do that, you need to come up with something else. I see. Your time is running. And my time is running. That's right. I would like to say that the reason I passed the Goodstein case to you is that it is from the My judge was on. Exactly. And it follows the It didn't fall off the turnip truck. It follows the Wu decision from the Washington Supreme Court, which the district court did not have the opportunity to review because it was decided subsequently. And under the Wu decision, we ask that there be found a duty to defend here. And I will reserve the rest of my time. Thank you. Morning. Morning, Your Honors. Chuck Spivak, Your Honor, on behalf of St. Paul Fire and Marine Insurance Company. Your Honors, the dichotomy between our two positions couldn't be more clear in this case. And I could not disagree more with the fundamental premise for the arguments in support of reversal. The differences in the policy language here are absolutely immaterial. And, Your Honor, your questions, I think, point out that that is exactly the case. Second, the second grounds argue for reversal that there is a different rule for contract interpretation under Washington law also clearly doesn't apply. Washington law does not say just simply pick words in isolation and get a dictionary out, see if the dictionary has more than one meaning, and if it does, decide that the word itself is ambiguous and thus the policy is ambiguous. If that were the case, virtually every contract would be declared ambiguous under Washington law because very few entries in the dictionary don't contain multiple usages or terms for the same word that's being defined. Instead, Washington law, just like the law of every court that has interpreted this policy language and found it to be unambiguous and clearly provides no coverage, says that you give the language of the contract the meaning that it has in the context in which it is used. And while individual words may have more than one meaning, in contextual analysis, only one meaning becomes clear. And in this case, the word privacy in this policy language only has one meaning that has a contextual clearness, and that is the type of privacy that's concerned about intrusions upon people's secret, personal, or private information, the right to privacy denoted by secrecy. Whereas the offense involved in this case is also equally clear. It contains nothing about secrecy. It has nothing to do about content. It cares not about content. The act is violated by the transmission of an advertisement that has nothing to do about the claim in itself. A plain piece of paper with nothing more than a Nike swoosh on it sent by an unwanted facsimile is violative of the act. Now, that may violate the privacy right connoted by the concept of the wanting to be free of unwelcome intrusions upon your seclusion, but it has nothing to do with the secrecy privacy right, the concern of an individual that secret, private information not be disclosed by a defendant to a third party. Your Honor, this court has the benefit of quite a bit of judicial precedent in regard to the issues that are before it, and that precedent is unanimous. Every court that's considered the policy language that's before this court has concluded there's no advertising injury coverage for the claim violation of the TPCA or its state equivalents, and as a result, there's no duty to defend. The Third Circuit in Melrose, the California Court of Appeals in ACS, the United States District Court for the District of New Jersey in Brother. The same result was reached by the Fourth Circuit in resource bank shares in a case involving policy language that the courts in Brother, ACS, and Melrose found was indistinguishable from the policy language at issue here. And even those courts that have found a duty to defend TCPA cases under completely different policy language have either distinguished those cases on the basis of the distinguished language or have gone on to say that our language, the different language, would have resulted in a different outcome. For example, the Tenth Circuit in the Park case calling our policy language that's before this court more tightly worded than the language that was before the court in Park. And in fact, the Third Circuit calls this policy language clear and ambiguous. And the Fourth Circuit describes this policy language in the terms that any underwriter would love to put up on a little note on their desk, written in admirably plain English. Now, these courts have reached these conclusions, employing rules of insurance coverage construction that are indistinguishable from the rules of construction that guide the court's hand here. The Washington Courts, the Virginia Courts, the Pennsylvania Courts, the California Courts, and the New Jersey Courts all construe insurance policies as a whole with the words read in context and not in isolation so as to give the words of the contract, when read as a whole and in accord with accepted rules of grammar, their fair, reasonable, and sensible meaning. Now, applying these rules, each of these courts have come to the only conclusion possible when examining this policy language against the offense that's embodied in the TCPA, and that is this policy language does not apply to the offense that's outlined in the TCPA. As a result, there's no coverage and no duty to defend. Now, in response to this, and I think appellants understand that they have a problem with the current case law, so they do three things. First, they argue that, well, you really need to be looking at the covered material language. There's a distinguishment in this language. And second, they argue that the Washington Supreme Court decision in Wu causes a change in this result. Let's talk about the covered material argument first. First, and I have to point this out, the argument that somehow a different result should be reached because this policy uses the phrase covered material, whereas other policies have used the phrase written or spoken material, popped up in this case for the first time in the reply brief submitted to this court. Not an argument that was made to the trial court, not an argument that was made in the opening brief, and is the subject of a motion to strike, which the court referred to this panel for determination. But even if this court were to consider the covered material argument, Your Honor, you're exactly right. It makes no difference. The only thing that it does is clarify that the means of transmission can include electronic transmission as well as written and spoken. And in regard to the argument that, by gosh, if you really meant for it to apply only to secret information, you should have thrown some language in there talking about the covered material being secret information, that would have been nonsensical under the context of this policy for two reasons. First, it would have then duplicated the concept of secrecy contained in the offense itself because the offense itself talks about the making known of material that violates a person's right to privacy, which the courts have denoted itself contains the secrecy connotation. So we would have, in effect, been saying, had we done what they wanted us to do, the publication of secret material that violates a person's right to have secret material not be published, duplicative. Second, this defined term applies to other portions of the policy, not at issue here, that really don't have anything to do with secrecy. For example, the communication, the making known of covered material that disparages or defames a person's goods, products, or services. Now, if you're going to put in the definition of covered material that it has to be secret material, then it would have no application to another point in the policy where that same definition is used that provides coverage when you defame, disparage, or talk bad about someone's goods, services, or products, which by definition isn't going to have to do with secret information. So it makes no sense for them to say that this definition of covered material makes any difference whatsoever when, one, it would have been duplicative in the policy itself, two, it would have made other parts of the policy to which this definition applies nonsensical, and three, it doesn't change the import of the policy. And don't just take my word for it. The courts themselves that have looked at this have examined this argument and have rejected it. The Brother Court itself specifically dealt with this argument that, you know, the resource case didn't use the phrase covered material. In Brother, we have the phrase covered material, and boy, that's the key. It only took the Brother Court a footnote to say it doesn't make any difference. There's no difference that we see between the two, and it's not the key. It doesn't promote a different result. Second, Your Honor, they make the argument that Washington's rules of construction under Woo mean that, boy, things really have to be different here than what's happened in Virginia, than what's happened in California, than what's happened in Pennsylvania, and that's what's happened in New Jersey. In Woo, they argue that any uncertainty, with uncertainty being defined as so long as the Washington appellate courts haven't ruled on it yet, there must be some uncertainty. It doesn't make any difference if every other court that has interpreted this language has said there's no coverage and no duty to defend until the Washington courts so rule. There must be some uncertainty under Washington law, and under Washington law, therefore, there has to be a duty to defend. First, this is not what the Woo decision says, and this is not what this court said Woo says in the case that was just handed to you. All Woo says is a restatement of traditional rules of Washington interpretation of insurance policies and the duty to defend. If there is uncertainty, uncertainty because you can't clearly say by looking at the language of the complaint versus the language of the insurance policy that there's no potential for coverage, then there's a duty to defend. But that doesn't translate uncertainty into saying that just because the Washington courts haven't ruled on it yet, there must be uncertainty. If that was what Woo says, then the Woo decision itself could have been considerably shorter because there weren't any other insurance coverage decisions out there involving the insertion of a boar tusk as a practical joke on an unconscious patient and whether there was coverage for that. So if Woo says it, by gosh, we haven't ruled on this situation yet, its opinion could have been pretty short. It would have said under every policy there's a duty to defend until a Washington court says that there isn't. But instead, what the Woo court did is what courts in Washington have been doing from time immemorial. They articulated the traditional legal standards for the duty to defend. They carefully analyzed three separate policies and four separate coverage grants, and they found a duty to defend only one policy and under one coverage grant. Had Woo been what they say that it would have said, their analysis could have stopped just by saying there's no Washington authority to direct this situation. Moreover, if Woo does say what appellants claim that it does, then the Woo court did what Washington courts say they will never do, and that is overrule decades of precedent sub silentio without comment. In this case, the precedent consisting of all decisions in which the Washington appellate courts held that insurers did not breach their duties to defend their insureds were open and unresolved in the sense that there was no prior Washington case law on point. We cite several cases on pages 42 and 43 of our brief. In Washington, it's not a remarkable concept that courts can be presented with a case of first impression on whether there's a duty to defend, and in some of those cases they find that there isn't a duty to defend. Now, if Woo says what appellant says that it says, it would have been incumbent upon the Washington Supreme Court to say, you know, we really don't ever mean to do that ever again. You're going to have to defend every case until we say you don't have to, and that's not the holding in rule. And don't take my word for it. I found out on Wednesday that there was a nice decision from the Western District of Washington in the case Continental Casualty Company v. Chorus Pharma decided in April of this year, and I will supplement the record pursuant to Circuit Rule 26 with a copy of this decision when I return to my office. The case can be found at 2008 Westlaw 180-5675. In that case, Judge Lasik noted that in apparent recognition of the fact that the case law is against them, and that's a quote, defendants argue that since none of the case law involved precisely the same policy language or the same set of facts, their insurers should have given them the benefit of the doubt and provided a defense relying on Woo. Quote, exactly the argument that we're being presented with here. Calling the language in Woo upon which defendants relied in this case dicta, Judge Lasik noted, and I quote, the court doubts that the Supreme Court intended to revolutionize Washington insurance law, however, and instead views Woo as an application of well-settled principles and a warning against relying on the advice of counsel in close cases. Other courts which have considered duty-of-defend cases since Woo seem to agree. Other than substituting the word conceivably for its synonym potentially, the analysis remains unchanged. And Judge Lasik cites the cases which he say don't view Woo as anything remarkable, and one of the cases that he cites is this court's decision in Goodstein v. Continental Casualty, 509 Fed 3rd, 1042, the decision that was just handed to us. He goes on to say, the key point, as stated by the majority in Woo, is that an insurer may not rely on an equivocal interpretation of case law to deny coverage where there is doubt about whether the allegations of the complaint could, if proven, give rise to a covered liability. The insured is entitled to a defense. Now, none of those conditions are present in this case. The case law is not equivocal. Every single court that has interpreted the exact language that's at issue here, or the language, I'm sorry. But there's different language that's been interpreted differently, and the question is, is the distinction really a distinction? In terms of at least sufficient to meet the duty-of-defend. Really, clearly not, Your Honor. The argument with regard to two different types of case law, I think first we have to keep our ideas as to what the different case laws are straight. Now, they're arguing there's two different types of St. Paul policy language. I understand that. But there's also some language that says something about publication. That's true. Now, there's the St. Paul language, and then there's the case law, and then there's the language having to do with publication as opposed to making known a material. Now, there are cases involving the publication language that hold that there's coverage. It's an awfully thin line, isn't it? It's not. Well, yeah, maybe it is, Your Honor. But in the eyes of the courts that have interpreted these cases, they don't think it's a thin line. Frankly, I think all the cases that have said that the publication language provides coverage, I think they're wrong. I think they parse words. The reason, I suppose, is because publication is a term of art in this area of the law that seems to be somewhat divorced from what's in it. Yeah, you know, I think the problem is that they focused on publication as opposed to the fact that under both policy languages, it's still the material that must violate the person's right of privacy, not either the publication or the making known. But if I could answer your question, even though my time is up, the point I want to make is there's really no distinction here because every one of those publication language cases, with the exception of one or two, was decided after the Fourth Circuit decided the resource case. And then several of them were decided after the Third Circuit decided Melrose. And so those judges had to somehow deal with those decisions in rendering their determinations that under the publication language there was going to be a duty to defend. And to a man and a woman, no one said that resource was wrong, that Melrose was wrong, that Brother was wrong, that ACS was wrong. They all say we're going to distinguish those cases based upon different policy language. So when I say there's not a single case out there that says that this policy language owes a duty to defend, I can say that without fear of correction because that's true. Every case that has interpreted this policy language has reached the result we asked this court to reach, and that is that there's no coverage and thus no duty to defend. Thank you. Thank you, Your Honor. Well, I beg to differ. Because it turns out that on via the insured in this case tendered in February of 2005, the only decision at that time that had been rendered by a court on St. Paul's language was in resource bank shares by the district court, and the district court found coverage and found that there was a duty to defend. That was the law that was in front of St. Paul at the time on via tendered, and St. Paul denied coverage knowing that the only ruling it had was that there was coverage and that the standard in Washington is could there conceivably have been coverage? The answer is yes, there could conceivably have been coverage. In fact, there was a period of time when St. Paul defended in the resource bank shares case. Thank you very much. Thank you to both counsel. The case has just argued. It will stand in recess for this session.
judges: Silverman, Berzon, Mahan